# UNITED STATES DISTRICT COURT
# DISTRICT OF NEVADA

\* \* \*

| | |
|---|---|
| KENNETH G. MCDONALD, | Case No. 2:17-cv-03066-RFB-DJA |
| Plaintiff, | **ORDER** |
| v. | |
| BRIAN WILLIAMS, et al., | |
| Defendants. | |

Plaintiff, who is a prisoner in the custody of the Nevada Department of Corrections ("NDOC"), and is serving his sentence as a Nevada Boarder at the Saguaro Correctional Center ("Saguaro"), a private prison run by CoreCivic in Arizona, has filed motions for a preliminary injunction and temporary restraining order in this case. ECF Nos. 11, 12. Defendants have also subsequently filed a motion to dismiss. ECF No. 37. For the following reasons, the Court grants Defendants' motion to dismiss and denies the other motions.

**I.     PROCEDURAL BACKGROUND**

On December 14, 2017, Plaintiff filed his original complaint. ECF No. 1-1. On September 14, 2018, the Court screened the complaint and dismissed the complaint as follows: (1) Count I, alleging deliberate indifference to unsafe prison conditions, dismissed without prejudice, with leave to amend; (2) Count II, alleging due process violations, dismissed with prejudice, as amendment is futile; and (3) Count II, alleging equal protection violations, dismissed, without

1

prejudice, with leave to amend. ECF No. 4. On October 10, 2018, Plaintiff filed his First Amended Complaint ("FAC"), which is now the operative complaint in this case. ECF No. 6. On May 16, 2019, Plaintiff filed his motions for a temporary restraining order and preliminary injunction. ECF Nos. 11, 12. The Court ordered a response to Plaintiffs' motions from Defendants on May 17, 2019. ECF No. 13. Defendants filed their responses and attached Plaintiffs' medical records regarding eye care on May 24, 2019. ECF Nos. 14, 15,16. On May 31, 2019, the Court screened Plaintiff's first amended complaint and allowed Plaintiffs' deliberate indifference to unsafe prison conditions and equal protection claims to proceed. ECF No. 17. On August 16, 2019, an inmate early mediation conference was scheduled and then postponed so that Plaintiff could appear by video. ECF No. 19. The inmate early mediation conference was held on September 20, 2019. ECF No. 27. A settlement was not reached. Id. Plaintiff filed an emergency reply to his motions on September 30, 2019. ECF No. 30. On November 22, 2019, Defendants filed a motion to dismiss. ECF No. 37. A response and reply were filed. ECF Nos. 40, 41.

## II. FACTUAL BACKGROUND

Plaintiff makes the following allegations in his complaint and motions for temporary restraining order and preliminary injunction:

While incarcerated at High Desert State Prison, on December 11, 2016 at about 12:30 PM, Plaintiff was working on the floor crew when he was informed that Defendant Warden Brian Williams and other administrative prison officials wanted the "old wax" stripped off the floor and a fresh coat of floor wax applied. Plaintiff then got a bucket and the wax stripper in preparation to strip the old wax from the floor. As Plaintiff poured the stripper into the bucket, the stripper unexpectedly splashed into Plaintiff's left eye. Upon entering his eye, the stripper caused the eye to burn immediately. Plaintiff entered the bathroom with a crew member and began to splash cold

water on his face and into his left eye. Plaintiff did this for approximately five minutes. He exited the bathroom once he could partially see again even though the burning had not yet stopped. At this point, Plaintiff's left eye was "as red as a tomato" because of the irritation. Plaintiff informed Lieutenant Potter about what had occurred, and Potter immediately ordered an officer to escort Plaintiff to the infirmary. At the infirmary, the nurse requested the chemical ingredients in the stripper. She then placed Plaintiff under the water where he rinsed his eye for an additional fifteen minutes. The nurse explained to Plaintiff that the stripper was highly corrosive and that he was lucky it did not get into both eyes. The nurse then had Plaintiff perform an eye chart test and discovered that Plaintiff's eye was so damaged that he needed to be transported from HDSP to an eye specialist at an outside facility. Plaintiff was then driven to University Medical Center ("UMC") in Las Vegas for specialized treatment. At UMC, on December 11, 2016, Plaintiff was seen and examined by a series of nurses and doctors. One of the physicians that treated Plaintiff informed him that he was not supposed to be exposed to toxic chemicals without the proper eye gear and safety garb.

Plaintiff alleges that Defendants Williams, Nash, Howell, Russel, Alvardo, and Potter failed to establish safety rules at HDSP or provide safety gear and that defendants knew that these chemicals were potentially hazardous and could cause "an excessive risk of harm to inmate safety." Plaintiff also alleges that he notified defendants prior to the accident about his safety concerns. Plaintiff also alleges that defendants were aware of the potential danger of the floor stripper as evidenced by prison staff's use of gloves and protective equipment when they handled such chemicals and cleaners. After treatment and consultation with UMC eye specialists, Plaintiff was informed that his eye had severe inflammation from the chemical in the stripper and that the pain would or could continue. Plaintiff was also told that the worst-case scenario would be that the

3

damage to his eye could result in permanent eye damage. The doctor advised that Plaintiff should be returned to UMC the next day, December 12. However, prison officials failed to bring Plaintiff to UMC on that day for follow up. Plaintiff therefore suffered increased pain that day. When Plaintiff's vision was tested on December 11 at UMC, the doctor informed Plaintiff that he had lost a certain percentage of normal vision. That damage remains to this day and has caused blurred and double vision. As a result of the eye injury, Plaintiff is now required to wear prescription eyeglasses.

On December 21, 2016, a special investigator interviewed Plaintiff to find out what had happened. The investigator advised Plaintiff that he would inform the warden and administrative prison officials to always have available to inmates the appropriate protective gear and establish a policy to protect inmates from injuries. The investigator would also suggest that the chemical potency of the products used at the prison be lessened for purposes of safety going forward. HDSP administration immediately set in motion safety rules and provided safety eye goggles after Plaintiff's accident.

On January 30, 2017, Plaintiff saw HDSP nursing staff about an eye appointment and the incident. On January 8 and January 14, 2017, Plaintiff put in a kite requesting to see an eye doctor for his injury and for eyeglasses. On March 25, 2017, Plaintiff had an appointment with the eye doctor, and that doctor determined Plaintiff's eyes were damaged from the December 11 incident. The doctor ordered glasses for Plaintiff. On May 3, 2017, Plaintiff saw and spoke with Nurse Tonya, who advised Plaintiff she would get Plaintiff his eyeglasses. On May 8, 2017, Plaintiff received his prescription eyeglasses. On December 21, 2016, Plaintiff filed his informal grievance regarding the December 11 incident. On March 8, 2017, Plaintiff filed his first level grievance regarding the incident, and on June 6, 2017, the grievance process had been completed. Plaintiff

states that he wrote a letter to OSHA on December 31, 2016, and he also wrote a letter to the Department of Labor and OSHA on February 28 and June 8, 2017. On March 9, 2017, Plaintiff received a letter from the Nevada regional OSHA office, indicating that the stripper that had splashed into his eye should be used with gloves and eye protection if one feels that one could splash the product onto the skin or into one's eyes while using it. It also explained that prison employees would need to be trained on the hazards associated with the product. By letter dated May 17, 2017, the Department of Labor explained that "state plans are required to have standards and enforce programs that are at least as effective as OSHA's."

On December 13, 2018 Plaintiff resubmitted a grievance concerning corrections officers intentionally refusing to mail his first amended complaint to the Court. About six days later, on December 19, 2018, Plaintiff was taken to the transportation building at HDSP where he was informed that he would be placed and transferred to a private prion in Arizona. The same corrections officer informed Plaintiff that the transport was ordered by Associate Warden Jennifer Nash ("Nash") of HDSP. Plaintiff was transferred to Saguaro in Arizona that same day.

Plaintiff was not afforded any type of due process hearing concerning the transfer from Nevada to Arizona. Plaintiff alleges that being transferred out of state by Nash was retaliation for Plaintiff having initiated this action in this Court. Plaintiff has to wear prescription glasses now because of the incident that took place on December 11, 2016. When he was transferred, Plaintiff was medically screened, and he informed the medical staff that he wears glasses. On January 4, 2019, Plaintiff put in a medical request for new glasses. A nurse saw him approximately ten days later. The nurse performed a scaled down paper chart eye test exam. The nurse explained that a request for funds had to be made by CCA/Sagurao to the NDOC for Plaintiff to see an optometrist. Plaintiff received no eye care. Plaintiff explained that he was experiencing severe headache from

5

light sensitivity in his left eye, and that his left eye feels strained. Plaintiff writes that this has been causing him pain as well as mental and emotional injury. Plaintiff filed another medical kite on April 6, 2019 for glasses after seeing multiple Nevada inmates meet with an optometrist, and receive their glasses.Plaintiff complains that his vision is getting worse as times goes by and that he fears irreparable harm. He also feels that not seeing the correct medical personnel will cause permanent damage to his eye.

Plaintiff further alleges that he is the victim of retaliation because according to Nevada Department of Corrections Director Dzurenda, only the "worst of the worse of N.V. inmates were to be sent to CCA/Saguaro."

Plaintiff seeks a temporary restraining order and injunction to be transferred back to the State of Nevada and to be placed back at the Southern Institution in Level One, and once there to receive proper care from an optometrist. He also seeks to be placed back in his working position on the floor crew/paint crew so that he may return to earning work time credits. Finally, he seeks a restraining order or TRO against Nash from further retaliatory acts against Plaintiff, including acts such as transfers to out of state prisons/and or maximum security prisons without due process and/or unproven claims, having Nash reside over any grievances, request forms, program activities, or anything of the like.

In his reply to the instant motions, Plaintiff further alleges that on July 11, 2019, he submitted another medical request for eye care. He was seen by a nurse on July 13, 2019. Plaintiff states that the nurse informed him that he would not receive eye care while housed at Saguaro. Plaintiff attaches to his reply as his Exhibit A, a sick call request placed with Saguaro dated July 13, 2019 in which he is told that he "do[es] not meet the criteria to see the eye doctor at this time. This was determined after you seen[sic] the nurse on sick call and had an eye exam." Plaintiff also

attaches a sick call request dated August 26, 2019 from another inmate, Exhibit B to his reply, in which the inmate is told by Health Services that "there is a waiting list for the eye doctor at this time. You will be seen in November 2019."

On November 12, 2019, Plaintiff filed a notice re prison conditions in which he informed the Court that he continues to be asked to strip wax off the floors in the new facility at Saguaro, but without being given the safety equipment that he needs, including eye goggles.

Plaintiff also alleges in his response to the motion to dismiss that as of December 10, 2019, he has yet to have seen an optometrist.

### III. LEGAL STANDARD

Courts may grant preliminary injunctions and temporary restraining orders pursuant to Rule 65 of the Federal Rules of Civil Procedure. Fed. R. Civ. P. 65. The analysis for a temporary restraining order is "substantially identical" to that of a preliminary injunction. Stuhlbarg Intern. Sales Co, Inc. v. John D. Brush & Co., Inc., 240 F.3d 832, 839 n.7 (9th Cir. 2001). A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 22 (2008). To obtain a preliminary injunction, a plaintiff must establish four elements: "(1) a likelihood of success on the merits, (2) that the plaintiff will likely suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in its favor, and (4) that the public interest favors an injunction." Wells Fargo & Co. v. ABD Ins. & Fin. Servs., Inc., 758 F.3d 1069, 1071 (9th Cir. 2014), as amended (Mar. 11, 2014) (citing Winter, 555 U.S. 7, 20 (2008)). A preliminary injunction may also issue under the "serious questions" test. Alliance for the Wild Rockies v. Cottrell, 632 F.3d 1127, 1134 (9th Cir. 2011) (affirming the continued viability of this doctrine post-Winter). According to this test, a plaintiff can obtain a

preliminary injunction by demonstrating "that serious questions going to the merits were raised and the balance of hardships tips sharply in the plaintiff's favor," in addition to the other Winter elements. Id. at 1134-35 (citation omitted).

A temporary restraining order may be issued without notice to the adverse party only if the moving party: (1) provides a sworn statement clearly demonstrating "that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition," and (2) sets forth the efforts made to notify the opposing party and why notice should not be required. Fed. R. Civ. P. 65(b)(1). Temporary restraining orders issued without notice "are no doubt necessary in certain circumstances, but under federal law they should be restricted to serving their underlying purpose of preserving the status quo and preventing irreparable harm just so long as is necessary to hold a hearing, and no longer." Granny Goose Foods, Inc. v. Bhd. of Teamsters, 415 U.S. 423, 439 (1974) (citation omitted).

When a party is pro se, the Court must liberally construe his or her documents. Erickson v. Pardus, 551 U.S. 89, 94 (2007).

**IV.    DISCUSSION**

    **a. Preliminary Injunction/TRO**

The Ninth Circuit has held "that there must be a relationship between the injury claimed in the motion for injunctive relief and the conduct asserted in the underlying complaint." Pac. Radiation Oncology, LLC v. Queen's Med. Ctr., 810 F.3d 631, 636 (9th Cir. 2015). The Ninth Circuit further explains that a sufficient nexus exists between the preliminary injunction and the underlying complaint when "the preliminary injunction would grant relief of the same character as that which may be granted finally." Id. (internal citations omitted). In his complaint, Plaintiff seeks $300,000 in compensatory damages and $10,000 in punitive damages and asks that "NDOC

pay for all medical costs now paid in the future."

The Court finds that the injunctive relief Plaintiff seeks is primarily related to claims that were not pled in Plaintiff's complaint. Plaintiff's allegation that his transfer to Saguaro is retaliation and that he was afforded no due process prior to his transfer are retaliation and due process claims. These claims were not alleged in Plaintiff's complaint. Because there is no sufficient nexus between the injunctive relief sought and the conduct alleged in the underlying complaint, the Court cannot grant the relief requested with regard to those claims.

However, the Supreme Court has found that allegations in motions for a temporary restraining order and preliminary injunction, together with supporting affidavit and briefs, may be adequate to apprise the defending party of the claims against them. Schlesinger v. Councilman, 420 U.S. 738, 742 n.5 (1975). This, in combination with the Court's duty to construe pro se complaints liberally, will permit the Court to construe Plaintiff's complaint as alleging a deliberate indifference to serious medical needs claim, which is sufficiently connected to Plaintiff's injunctive relief seeking requested eyecare.

A prison official violates the Eighth Amendment when he acts with "deliberate indifference" to the serious medical needs of an inmate. Farmer v. Brennan, 511 U.S. 825, 828 (1994). "To establish an Eighth Amendment violation, a plaintiff must satisfy both an objective standard—that the deprivation was serious enough to constitute cruel and unusual punishment—and a subjective standard—deliberate indifference." Snow v. McDaniel, 681 F.3d 978, 985 (9th Cir. 2012).

To establish the first prong, "the plaintiff must show a serious medical need by demonstrating that failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain." Jett v. Penner, 439 F.3d 1091, 1096 (9th Cir.

2006) (internal quotations omitted). To satisfy the deliberate indifference prong, a plaintiff must show "(a) a purposeful act or failure to respond to a prisoner's pain or possible medical need and (b) harm caused by the indifference." Id. "Indifference may appear when prison officials deny, delay or intentionally interfere with medical treatment, or it may be shown by the way in which prison physicians provide medical care." Id. (internal quotations omitted). When a prisoner alleges that delay of medical treatment evinces deliberate indifference, the prisoner must show that the delay led to further injury. See Shapley v. Nevada Bd. of State Prison Comm'rs, 766 F.2d 404, 407 (9th Cir. 1985) (holding that "mere delay of surgery, without more, is insufficient to state a claim of deliberate medical indifference").

The Court finds that Plaintiff has raised serious questions going to the merits of a deliberate indifference claim and that the balance of hardships tips in his favor. Plaintiff has alleged facts sufficient to demonstrate that Defendants have deliberately delayed getting adequate treatment to Plaintiff, and that the delay has caused Plaintiff further pain and injury. ECF No. 12, Pl.'s Mot. Preliminary Injunction ("Plaintiff complains that his vision is getting worse as time goes by . . ."). Defendants assured the Court in their response to Plaintiff's emergency motions that they "would represent that they will contact SCC medical staff and attempt to expedite the process." ECF No. 14, Def.'s Resp. Opp'n Mot. Preliminary Injunction 11. But Defendants have not submitted anything to the Court indicating that they have in fact done so.

Plaintiff has also raised questions as to the accuracy of the medical records submitted, which included an initial intake screening for Saguaro that stated that Plaintiff did not use prescription eyeglasses and has 20/20 vision in the eye involved in the wax stripping chemical incident. Plaintiff alleges that the eye exam that Saguaro Correctional Center used to determine whether Plaintiff met criteria to see an eye doctor required him to read the three top lines of an eye

chart held in his hands, rather than twenty feet away, as the chart required. The Court also notes that the medical records provided only documents Plaintiff's medical history since his incarceration at Saguaro Correctional Center, rather than since the incident involving the wax stripper, which is the incident that prompted Plaintiff's need for eyeglasses. Furthermore, as of December 10, 2019, Plaintiff has still not been seen by an eyecare professional, several months after he first made the request. ECF No. 40, Pl.'s Resp. Opp'n Mot. Dismiss at 5. Id. The Court thus finds that the balance of equities tips in favor of Plaintiff receiving the requisite eyecare. The Court will subsequently grant Plaintiff's injunction only to the extent of ordering the NDOC to provide Plaintiff with the requested eyecare.

The Court significantly narrows Plaintiff's injunctive relief and notes that even if Plaintiff were to amend his complaint to include retaliation and due process claims, the Court would not necessarily then grant a renewed motion for a preliminary injunction on those claims. First, the Prison Litigation Reform Act requires that injunctive relief granted to prisoners be narrowly drawn, and an order to have Plaintiff transferred back to Nevada on the ground of inadequate healthcare at Saguaro is not narrowly drawn. 18 U.S.C. § 3626 (a)(2). Second, the Supreme Court has already found that there is no constitutionally protected liberty interest in an interstate prison transfer. Olim v. Wakinekona, 461 U.S. 238, 245–46 (1983).

The Court has jurisdiction to grant this injunction because, although Plaintiff is currently incarcerated in Arizona, he remains under custody of the Nevada Department of Corrections, and Saguaro Correction Center functions as an agent of the Nevada Department of Corrections in this case.

**b. Motion to Dismiss**

In their motion to dismiss, Defendants argue that because Plaintiff's complaint asks only

11

for monetary damages, the Eleventh Amendment bars him from bringing suit against them. The Eleventh Amendment bars suits against state officials in their official capacity unless Congress has abrogated state sovereign immunity under its power to enforce the Fourteenth Amendment or the state has waived it. Holley v. Calif. Dep't of Corrections, 599 F.3d 1108, 1111 (9th Cir. 2010). However, the Supreme Court has previously allowed an exception to Eleventh Amendment sovereign immunity in cases where a plaintiff brings suit against a state official alleging a violation of federal law. Ex Parte Young, 209 U.S. 123 (1908). Under this exception, the court may award prospective injunctive relief that governs the official's future conduct, but may not award retroactive relief that requires payment of funds from the state treasury. Natural Res. Def. Council v. Calif. Dep't of Transp., 96 F.3d 420 (9th Cir. 1996); citing Pennhurst 465 U.S. 89, 101 (1984). In the context of § 1983 claims, this means that Eleventh Amendment immunity prevents prisoners with § 1983 claims from recovering monetary damages. See Peralta v. Dillard, 744 F.3d 1076, 1083 (9th Cir. 2014) (noting that Eleventh Amendment immunity prevents prisoners from recovering monetary damages for § 1983 violations).

Plaintiff argues in return that he does seek injunctive relief in his complaint, because his request that the prison cover all current and future medical expenses is prospective injunctive relief. The Court agrees with Plaintiff, and also notes that in Plaintiff's motion for a preliminary injunction, he asks for transfer back to HDSP specifically so he can receive eyecare. Thus while the Court finds that Eleventh Amendment immunity operates to dismiss Plaintiff's damages claims against the NDOC officers in their official capacities, it will not wholly dismiss the complaint, and will allow the claims for injunctive relief to proceed.

. . .

. . .

## V. CONCLUSION

For the foregoing reasons, **IT IS ORDERED** that Plaintiff's Motions for a Preliminary Injunction (ECF No. 11) and for a Temporary Restraining Order (ECF No. 12) are granted in part as follows: the Nevada Department of Corrections **is ORDERED** to provide Plaintiff with an appointment with an optometrist by March 31, 2020, or file a notice with the Court explaining why the order was not complied with by that date.

**IT IS FURTHER ORDERED** that Defendants' Motion to Dismiss (ECF No. 37) is **GRANTED** in part. The Court dismisses all Plaintiff's claims for monetary damages against Defendants Brian Williams, Jennifer Nash, Howell, Russell, Lt. Potter, and Alvarado in their official capacity. The Court does not dismiss Plaintiff's claims for injunctive relief.

DATED March 16, 2020.

**RICHARD F. BOULWARE, II**
**UNITED STATES DISTRICT JUDGE**